Good morning. Good morning, Your Honor. Please the court. My name is Tim Ford and I represent Don and Christy Gravelet-Blondin. Mr. Blondin, could you stand up please, sir? I measured it this morning, Your Honors. That is the distance from which Mr. Blondin- If you can use the microphone. That is the distance from his neighbor, Jack Hawes, that Mr. Blondin was standing when he said, What are you doing to Jack? That is the distance if you were- According to his measurement. According to his measurement, which, of course, he made the measurement. He's the only one who did make the measurement. You can sit down now, Mr. Blondin. Thank you. The officers did not make any measurement. They had estimates that ran from 10 feet to 25 feet. They actually had a device called an AFID that's in this taser that would measure the spot. That's what it's for. It shows where the taser was fired and where the person was hit. But Officer Shelton gathered that up and didn't keep that evidence. Mr. Blondin, who lived there, went out and measured it. He's an electrician. He knows how to measure things. He has a tape, just like I did today. 37 feet away. In Sergeant Shelton's own testimony, he said if it was 35 or 40 feet away, it was probably not reasonable to shoot him with the taser. That is the place where Mr. Blondin stopped. And remember, the first thing that the officers said to him was, Stop. And Officer Shelton, Sergeant Shelton, heard the other officers say, Stop. And he saw Mr. Blondin stop and stand there with his hands by his side. He didn't claim to have a bladed stance or an aggressive demeanor. He wasn't yelling. He wasn't threatening. He wasn't armed. He was a neighbor standing there looking. And Officer Shelton ran up to him with what appeared to be a gun pointed at him, screaming, Get back, get back, get back. And he stood there frozen with fear. And that's what the only objective uninvolved witness, a man named Steve White, says. It was obvious he was frozen with fear for five to ten seconds. And then he was shot with his taser. Well, I can certainly understand, Counsel, that there are factual disputes here, and maybe those facts are sufficient such that they need to be resolved by the jury. But I think your argument underplays the context and totality of the circumstances here. You've got an incredibly volatile situation, arguably even more of a volatile situation than the one involved in the Matos case, where the officers knew that there was a gun present at the scene that was unsecured, five officers responding to a suicide attempt. They hadn't gotten the victim under control. And then here comes Mr. Blondin inserting himself into that situation. And I'm sure you can appreciate that officers under those circumstances would need to adequately maintain and control the scene. So what level of force is appropriate when they have somebody who's nonresponsive and who, according to Mr. Blondin's testimony, was frozen for about 15 seconds? Do they have to keep repeating commands? Can they push him back? What are they supposed to do that would have been reasonable in your view? The most reasonable thing would be to do nothing. Remember, Mr. Blondin wasn't moving. He was standing there. He was 37 feet away. The officer, Sergeant Shelton, was not involved in the struggle with Mr. Hawes. Do nothing. Well, let me take that further for a moment. So do nothing, but at the same time somebody would have to have divided attention to watch him, right? Because here's a person they don't know who came out of his house injecting himself into a very volatile, dangerous situation. So I would think a reasonable officer would have to keep him secured if he doesn't move farther back in order to get back to the scene of what they were doing. And that's what he was doing. That's what Sergeant Shelton was doing. Remember, Sergeant Shelton's job was not to hold on to Mr. Hawes, and actually there's evidence, the testimony is disputed, about whether Mr. Hawes was already handcuffed. That wasn't Sergeant Shelton's job. His job was to maintain the scene. That's what he did. He was between Mr. Blondin and the officers. He was facing Mr. Blondin with the taser pointed at him. If Mr. Blondin had moved, he could have shot him. If Mr. Blondin had tried to approach the scene, with this language we have, injected himself into the scene, that, I think, Your Honor, is the defendant's rhetorical way of obscuring the fact that Mr. Blondin's testimony is 37 feet away. He's not in the scene. He's 37 feet away, and there's an officer between him and the scene, the officers who are taking Mr. Hawes into custody, who are tasing him. Remember, they're tasing him at Sergeant Shelton's command. Sergeant Shelton uses the taser even more than his employer wishes him to. That's in his personnel record in general. He's ordered a tasing of a 79-year-old man, and this person has come 40 feet away, almost 37 feet away, and challenged that and said one time, What are you doing to Jack? Was it reasonable for the officers, in this circumstance, when someone they don't know steps out and says, What are you doing with Jack or what are you doing with my friend Jack, which would tell them that the individual knows Jack well enough, calling by his first name, that there is a possible danger of interfering with the attempt to subdue the suicide attempt. Anything is possible. Mr. Blonin looked like a neighbor. He was wearing shorts and a T-shirt. I'm trying to separate this out from what happened after that, but at that moment when that statement is made, is it your position that the officer should have done nothing? It's my position that Sergeant Shelton could have moved, and as he did, fine, in front of Mr. Blonin, and he could say, Get back. And he, I guess, could point a taser at him if he wants. We don't have a problem with that. Well, Mr. Blonin just stands there. He did warn him that if he didn't get back further, he'd get tased. And 15 seconds is quite a length of time. Well, but remember, it's 15 seconds from the very first statement, and then according to the officers, there are at least seven statements of get back, get back, get back. So I think that Mr. Blonin standing there in the quiet may have lasted just a couple or three seconds if you take that out of there. But Mr. Blonin's testimony is the only time Sergeant Shelton said, Sit back or I'll tase, was simultaneously with tasing, which is no warning at all. But remember, Mr. Blonin is not moving. Sergeant Shelton is in between him. That's Sergeant Shelton's job is to protect the scene. He's protecting the scene. The scene is safe. No one is interfering. Yes, they have a reason to be concerned, so they post an officer in front of him that can stop him. And then he does nothing. How many people were milling about or out on the periphery? Does the record reflect that? I don't know that I have an exact count. I think the record probably does. I think there were three or four. Mr. Blonin's wife, of course, was there. She had come out also. Steve Knight was there. But it wasn't like a crowd. It wasn't anything like the Lalonde case where there were people pushing up to the officers or somebody came actually, when you say injected into the scene, 37 feet away, five officers on one 79-year-old man with an officer posted in between and actually a second officer with a rifle in between that person and the man. It's not really in the scene. Well, assuming that the force was excessive, what about the qualified immunity analysis given the state of the law as to taser use at that time? If you look at the cases, and I think we've quoted a long Sixth Circuit case, we've given a recent case from the Seventh Circuit, the Abbott case. There's no case in the country that has ever approved the shooting of somebody who's sitting there passively, who's not actively resisting, physically resisting, or threatening. In the Mattos case, there was an actual brawl going on. It was very close quarters. The person who was right in the middle of it was actually in between the officers and the person they were fighting with, not 37 feet away. So I think no reasonable officer, and we provided a compendium of hundreds of cases from around the country, and nobody has identified a single case where anyone was arrested for obstructing or tased for anything like standing there and not moving for 10 to 15 seconds 37 feet away from a scene. Is it your position that the force employed was excessive, or that in this circumstance no force should have been employed? I think it depends on what you mean by force. I think certainly Sergeant Shelton, if Mr. Blonding continued to stand there, could have gone up and done an arm hold and said, move away, sir. I think that he was using some force by pointing a taser at him, but it's a minimal force situation. And, of course, we have a city that had an unconstitutional policy that allowed minimal force, that ranked tasers as a minimal force, which is unconstitutional. The district court found so, and the defendants haven't contested that. And Sergeant Shelton said exactly what the policy was, which is, we tell you to leave, we ask you to leave, we tell you to leave, you don't leave, we can tase. And that's not an appropriate standard of what this court said. That's what the policy told him. The policy said it was the lowest level of force. And he said in his review, talking about this case, and the defendants have actually admitted that in their brief here, he was talking about this case and other cases where Sergeant Shelton had been criticized for using the taser too often, he said, all my tasings are within policy. So he was following a policy that was unconstitutional, the defendants admit, and this court has held. The taser that was employed here, was it a dual mode taser? Yes. What mode was used? Dark. The most severe mode, the mode that completely incapacitates you, that run electricity through your body, that causes excruciating pain, and was extremely traumatizing and damaging to this man who was a war veteran and an electrician by trade. So this was an extremely high degree of force used in a situation that didn't call for anything. It was a man standing there with his hands by his side. And remember, the challenge, they say the distraction, the divided attention, what does it come from? It comes from him saying, what are you doing to Jack? Well, that is protected activity. You're allowed to do that. Houston versus Hill, the person in Houston versus Hill, did far more than that. And the Supreme Court said you could not charge him with a crime, let alone use this drastic level of force on them for distracting. And if you look what all the officers say, they were distracted by yelling. Who yelled? Sergeant Shelton and Mr. Flanagan said, what are you doing to Jack? Constitutionally protected activity. You may want to save a little bit of time for rebuttal, but let me have you briefly address Brooks. Now there, a pregnant woman during a car stop with very minor crime, if it's criminal at all, was tased and qualified immunity was given. How does your case compare to that? Well, she was physically resisting. The officers were trying to pull her out of the car, and she was fighting them, and she was pulling back. There was a physical encounter, and they used not the darts, which go into your skin and paralyze your whole body, but the drive-stun mode that causes pain to try and get her to let go. But she was struggling over a prolonged period, and she was the criminal that was being arrested. Mr. Flanagan was not the criminal. He was an onlooker looking out for his elderly neighbor who said, what are you doing to Jack, and stood there with his hands by his side. That's a very different situation. Thank you, Counsel. Thank you. May it please the Court, good morning. Richard Jolly on behalf of the appellees. I'd like to begin by highlighting the broader factual context in which this incident occurred. We would submit that a thorough review of the totality of the circumstances here, all the facts leading up to Mr. Blondin ultimately being tased, that those are critical to evaluating the officer's actions and the merit or lack thereof of the appeal. But we think it's also worth highlighting the facts here, because appellants tellingly so conspicuously ignore everything leading up to those few seconds just prior to Mr. Blondin being tased. Now, the police are not out there at this location on this particular day by happenstance. They are out there literally on a dangerous, life-saving rescue mission. No one, Counsel, no one disputes that. No one disputes this is sort of a corollary of my father's advice, never interfere in a bar fight. The question is what happened from the moment Mr. Blondin was told to stop until he was tased and whether the use of force in that circumstance was appropriate. That's the case. And, Your Honor, I'm not trying to dodge the question, so I'll just briefly touch on this. But I do think that the perceptions of the officers on the scene are important, and they are operating under an assumption that Mr. Hawes, the suicidal subject, has a firearm, and he is, quote, armed at all times. And so I think that that just ---- I give you all of that, and I certainly give you that the first thing that Mr. Blondin said may have raised the ears of the officers that they may have someone who might interfere in the carrying out of their duties. The question is from the moment one of the officers said halt, and apparently he did, from that point until the point at which the dart mode of the taser was used, was that excessive? The district court said no, and you think no. Tell me why. When you look at the totality of the circumstances, that Mr. Blondin, he stops, and we'll concede for the purposes of today, that he stops at 37 feet. Now, whether 37 feet is where Mr. Blondin was standing, I realize that the court doesn't need to take that into consideration. We've got a record here, and that's what the court's relying on. But at the time that the police officers tell Mr. Blondin to get back, 15 seconds elapses, and it's undisputed that he's told repeatedly to get back, and he's told that if he doesn't get back that he'll be tased. Was he armed? He was not. Was there any basis for any gestures? No, and we would concede that in a vacuum, Mr. Blondin just standing there saying, what are you doing to Jack, is not a justification for using even low-level force or for an arrest. But as the case law dealing with force issues points out, that the gram factors along with the tangible gram factors such as the severity of the crime and the type of resistance, the case law points out that the totality of the circumstances have to be considered. And so here, by Mr. Blondin refusing to back away, even at 37 feet, that causes alarm with the officers. It's noted in the record that the officers are concerned because it's unusual when someone is repeatedly shouted at to back away, especially when the kind of activity that's going on here is occurring. The officers are thinking, what's happening here? Why isn't this man moving? And 15 seconds under these circumstances where there is a firearm that's not yet accounted for, we would submit to the court that 15 seconds is an eternity. What do we make of the statement the sergeant made to Mrs. Blondin? I don't see that that's material at all, Your Honor. It's after the fact. In considering the force that's being applied with Mr. Blondin, now whether Sergeant Shelton's bedside manner raises questions, I think that that's... It's a little more than bedside manner, counsel. He basically said to her, do you want some of this? But as far as what Officer Shelton's or Sergeant Shelton's state of mind was, after the fact as it relates to Mrs. Blondin... Where was she? She is on her property. Now, I think that that is a distinction worth noting. Where was she in relation to Mr. Blondin? I don't think that the record references that one way or the other, Your Honor, and I'm not going to speculate other than that she's on her property. Had she said anything? Again, I'm not going to speculate, Your Honor. Had she been told to step back? I'm not sure. Did she pose a threat? No, absolutely not. But at the time that Sergeant Shelton is communicating with her, at this point we know that Mr. Hawes, the man who had a firearm in his vehicle, the man who's actively trying to kill himself, we know that he has already been handcuffed and it's well after the fact. And, again, we can appreciate that Sergeant Shelton's interactions, assuming that for our purposes here today that what Mrs. Blondin relayed was accurate, assuming that that's true. Was there any evidence in the record to the contrary? No, but we would submit that it's immaterial as far as considering whether the force applied to Mr. Blondin was constitutional. Well, but her claim relates to what she saw happen to her husband, not independently that Sergeant Shelton told her that, you know, words to the effect that she would be tased as well. I think that the claim, that the outrage claim, relates to what she observed rather than what Sergeant Shelton told her. But your opposing counsel argued that Mr. or Sergeant Shelton's job was to maintain control of the scene. And so when Mr. Blondin was noncompliant, he could have just, I guess, stood there and guarded him. Is that reasonable under the circumstances? We would submit that that is classic 2020 hindsight that all of the case law dealing with qualified immunity warns against. That here, in a sterile environment where we have time to consider things at a much more leisurely pace, where there is no life and death situation that's evolving, then maybe that's the case. But under the circumstances there, we're talking about 15 seconds total. And Sergeant Shelton doesn't have to make just, qualified immunity case law is clear, that Sergeant Shelton doesn't have to make or exercise the minimum amount of force, and he doesn't have to exercise the absolute best option. He just merely has to exercise an option that would lead a reasonable officer to conclude that his conduct or her conduct was lawful under the circumstances. And so we would submit that by suggesting that there are other alternatives, that that doesn't mean that Sergeant Shelton should not be afforded qualified immunity. There was testimony in the record, I believe by another officer, that he had a gun and he felt that his gun was unsecured as well. Can you talk a little bit about that? What is that all about? One of the deputies from Snohomish County, there were three different police agencies that were involved here. One of the deputies who was actively grappling with Mr. Hawes, he had a rifle slung on his back because when they first went out there to the scene and they knew that Mr. Hawes, the suicidal subject, was armed, the police felt that a long rifle might possibly be needed. He had a rifle slung on his back. He's got his back turned to Mr. Blondin as he is dealing with Mr. Hawes. And Deputy Bowman testified, and it's in the excerpts of record here, that he was concerned because he had the rifle on his back. This man is approaching, and I think this goes back to your point, Your Honor. When Deputy Bowman indicated that he was concerned because Mr. Blondin was not complying, it wasn't the fact that Mr. Blondin yelled, what are you doing to Jack? It's the fact that under these circumstances, here's an unknown entity that is refusing a very simple command, which is back up, get back. But the first command was stop. Well, Your Honor, I think that the record is. . . And is there a yes or a no in your lexicon? Your Honor. . . The first command was to stop, wasn't it? As far as what the record actually reflects, I'm not going to concede that point, Your Honor. It is at some point somebody tells him to stop, but what we know is that he is repeatedly told to get back. And I can read right here from the excerpt of record, Mr. Blondin's testimony on this is crystal clear. He's not confused. The reason he doesn't back up is because he says that he's frozen with fear. And this is an excerpt of record 378. Question. From the time you were told to get back until you were tased, did you ever retreat? Answer no. Why not? I don't know why. I tried. I wanted to. I just didn't know what to do. Now, when you say you, quote, tried, describe for me what you mean. I tried to make my feet move. I tried to get out of there. It just didn't work. So Mr. Blondin is not saying that he didn't back up because he was confused. He's saying that he didn't back up because he was frozen with fear. But that would require the officers to somehow discern, under these stressful circumstances, the subjective intent of Mr. Blondin. And because I am running short on time, I'll quickly move over to the Monell claim. We would submit to the court that there is a rigorous causal standard that requires a showing, some evidence from appellants, assuming that there was a constitutional violation here, that it was caused by the policy of the city of Snohomish. We'd readily concede, based on the holding in Brian V. McPherson, that use of a taser is not low-level force. It's intermediate force. And the city of Snohomish policy, at the time of this incident, was in tension with that. And so we would acknowledge that the policy itself was constitutional. But that's not the end of the analysis. That's the beginning. And there is no evidence before the court that Sergeant Shelton tased Mr. Blondin because of the policy. Reading from the excerpt of record, question, did you tase Mr. Blondin because of a specific city of Snohomish policy regarding the use of force? Answer, no. And that's at excerpt of record 398. Sergeant Shelton also testified that under the circumstances, he thought that a higher level of force would have been justified, i.e., a baton, pepper spray, something else beyond the taser, but that he just chose the taser because he thought that was the best tool to achieve the law enforcement purpose, which was to incapacitate Mr. Blondin so that there was no longer a distraction, there was no threat from him, as the officers were still grappling with Mr. Haas. The plaintiffs had a second theory of municipal liability, didn't they? Your Honor, I think that they were alleging. Based on ratification? They were alleging a ratification, Your Honor. Did the district court address that? Well, Your Honor, we would submit that the only. Once again, counsel, yes, no, I don't know. I'm going to check the record. I'm checking right now, Your Honor. The answer is no, isn't it? That the district court didn't. As I'm looking here, Your Honor, and I did have to look, the answer is no. What did we make of that? Addressing that, that the only information that the city had to evaluate this incident were the reports of the officers, and so as they are reading this, they are not ratifying something unconstitutional. Any approval by city policymakers was based on what the officers were reporting as, in fact, constitutional conduct, and there is an uphill battle to prove a ratification claim, and we would submit to the court that there's nothing in the record that would support that. Lastly, moving on to the state law claims. This court is well aware of the probable cause standards. Probable cause is not a particularly difficult standard to meet. Could a reasonable officer, under the circumstances, believe that a crime had been committed and that Mr. Blondin committed it? And here we're talking about obstructing, and all that is required for obstructing is that Mr. Blondin had a knowledge that a police officer wanted him to do something, and two, that he is hindering, delaying, or obstructing. We would submit that under the circumstances, that probable cause is clearly met here, and that that's a complete defense to the state law claims of malicious prosecution and false arrest. Doesn't obstruction under Washington law require an affirmative act? Your Honor. Once again, counsel? Yes? No? I don't know? I would say it depends, and I understand. That's a direct answer. Go ahead and explain. Okay. What is required for willfulness is not an intent to obstruct, but just the fact that the person, and this is based on Washington case law, that the person who is refusing to obey the order of the police officer knows that it's a police officer, and he's not doing it. That is the willful or the intent requirement. It's not that he specifically has to intend on obstructing, just that he's aware that it's a police officer, and he's aware that he's not doing what the police officer wants him to do. I probably didn't ask the question well. Does Washington law, in terms of obstruction, require an affirmative act? That one I will answer, I don't know, Your Honor. Here, I think that whether the answer My research suggests that it does. Let's assume that it does. What was the affirmative act? That he's told repeatedly, over the course of 15 seconds, to simply back up, and he fails to do so. We would submit that that is more than sufficient to establish probable cause. But is it an affirmative act? He just stood there. Your Honor, I think that that's splitting it too fine. I think that under those circumstances, someone simply refusing to do anything would never lead to being able to charge someone with obstructing. It's like, I'm not doing what you want me to do, regardless of the circumstances. I think an affirmative act is something much more than physically moving forward or physically under. Failure to do something can be an affirmative act. Is the analysis different if you're with an arm's length of the officer or you're 37 feet away? I think it depends on the circumstances. Well, these circumstances. Under these circumstances, given that there is an unaccounted-for firearm, and given that we've got someone who is intent on taking his own life, we would submit that under these circumstances that probable cause does exist to charge. Thank you. All right. Thank you, counsel. The Washington law was actually changed because previously it made it a crime to disobey a lawful order, and the state Supreme Court said that was unconstitutional. So that law doesn't exist anymore. It does require an act that actually obstructs and an intent to obstruct. With regard to the policy question, I don't think I've ever seen a case in which there was actually so much evidence that the policy caused this action. Sergeant Shelton said, if you don't leave, we tase. Sergeant Shelton said, reviewing this year's actions, the year that this took place, all my tasings are within policy. He used the policy to defend himself. The chief was asked about the policy and deposition. Given all the facts, he said that's within policy. There are experts that said that policies affect officers' behavior, and the only thing that is offered to break that chain, the thing that Mr. Jolly read to you, was a leading question that he gave to his client at the end of his deposition to say, no, the policy didn't affect me. If that's all it takes, then there's never going to be manel liability because you can always do that and get your client to deny that the policy affected them. The Supreme Court assumes the policy did, and everything Sergeant Shelton and his chief have said indicates that's the case. Now, 15 seconds, at some point it's an eternity, at some point it's a split second. It's 15 seconds. Officer Shelton, Sergeant Shelton, I think, is required to see what's right in front of his face. Mr. Knight, who was not looking right at Mr. Blondin, could tell that this man was frozen with fear. Sergeant Shelton could tell for maybe up to 15 seconds. I think it's actually more like 5 or 10 seconds after the yelling stops, the yelling that was distracting the officers, the yelling that was primarily by Sergeant Shelton, not by Mr. Blondin. Sergeant Shelton could see for 15 seconds or 10 seconds that Mr. Blondin was standing there. I'll stand here for 10 seconds. Was there any evidence in the record from Mr. Blondin's either declaration or deposition testimony that he was confused by the conflicting commands, stop and get back? He's very honest. He said his memory now, of course, he was tased and it was traumatic. He doesn't remember the first stop, although he did stop. But it's important, and the defendants make much of that, but really the important thing is Sergeant Shelton heard stop. Sergeant Shelton heard another officer say stop, and he saw Mr. Blondin stop. He knew that this was a man who had just followed the command and then was standing there again, and I don't have 10 seconds hardly left, for a long period of time. It wasn't like he thought Mr. Blondin was about to move. It wasn't, as the last case, the dog case, a dynamic situation. It was a static situation. Mr. Blondin was standing still, and Officer Shelton was in between him, had a weapon, and was able to keep him away from the officers 37 feet. A jury should be able to consider whether it was reasonable or whether, as I think Judge Hawkins' questions indicate, this is an officer who tases unreasonably. This is the kind of officer that qualified immunity does not protect. My questions suggested nothing of the kind. I'm sorry, the fact. I ask questions, and I get answers, and I fold them into the decision-making. And what I meant was the fact that you pointed out, which was that this officer threatened this woman when she thought her husband had been killed. I just asked counsel what we should make of that, and he answered appropriately. And my answer would be you should make that this is the kind of officer that is incompetent and willfully violates the law, and uses his taser when anyone should know it's not appropriate, and when you can search the casebooks of the United States, and you will never find a case where someone was tased for just standing there like this. Thank you. All right, thank you very much, counsel. We appreciate both your arguments. The matter will be submitted for decision.
judges: Selna, Hawkins, Nguyen